UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| In re BIOSANTE PHARMACEUTICALS, INC. DERIVATIVE LITIGATION | ) ) ) | Case No. 1:12-cv-03480 |
| | ) | Judge Joan B. Gottschall |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

786881_1

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by plaintiffs on behalf of Nominal Party BioSante Pharmaceuticals, Inc. ("BioSante" or the "Company") against certain of its officers and directors.   Defendants are Louis W. Sullivan, Steven M. Simes, Fred Holubow, Ross J. Mangano, Edward C. Rosenow III, Stephen A. Sherwin and John T. Potts, Jr.

2.     Between at least February 8, 2010 and December 15, 2011, defendants breached their fiduciary duty of loyalty by making or causing to be made false and misleading statements about the commercial viability, efficacy, and market potential for LibiGel®, an experimental drug designed to improve the sex drive of women suffering from a type of female sexual dysfunction referred to as Hypoactive Sexual Desire Disorder ("HSDD").

3.     More specifically, defendants caused BioSante to misrepresent LibiGel's effectiveness over placebo, and provided supposedly reliable "data" concerning LibiGel's "statistically significant" effect on increasing the "number of satisfying sexual events" for women suffering from HSDD.  These purportedly positive clinical trials furthered defendants' claims that LibiGel was "the most clinically advanced pharmaceutical product in the U.S." for the treatment of HSDD.  Defendants further misled BioSante shareholders by falsely describing the market potential for LibiGel as comparable to the male market for erectile dysfunction drugs, comparing LibiGel to such blockbuster drugs as Viagra, Levitra, and Cialis and suggesting that LibiGel could tap into a $2 billion market.   In fact, however, LibiGel's actual performance and efficacy fell far short of defendants' misrepresentations.

4.     Defendants' statements regarding LibiGel failed to disclose the risks related to the probable chance that the very parameters by which HSDD is defined would significantly limit LibiGel's market potential were it approved by the Food and Drug Administration ("FDA").  Specifically, the Fourth Edition of the Diagnostic Statistical Manual of Mental Disorders ("DSM-

- 1 -

IV"), published in 1994 by the American Psychiatric Association ("APA"), describes HSDD and defines its symptoms. However, in May 2013, the APA will publish the Fifth Edition of the Diagnostic Statistical Manual of Mental Disorders ("DSM-5") which will no longer include HSDD as a recognized individual disorder. Under the final draft of the DSM-5 that was closed for public comment on June 15, 2012, HSDD is being eliminated and its symptoms categorized as part of a more restrictive category of Female Sexual Dysfunction ("FSD") called Female Sexual Interest/Arousal Disorder ("SIAD").

5. The significant risk that the elimination of HSDD as a defined disorder would occur was known to defendants well before the 2012 final draft of DSM-5, but was not publicly disclosed. The proposed removal of HSDD as a disorder is a critical, material fact that defendants failed to address during the Phase III LibiGel efficacy trials. The APA published a draft of its proposed revisions, including the subsuming of HSDD into SIAD, as early as February 10, 2010. Thus, if the new definition of HSDD was accepted, it could severely limit the market for LibiGel.

6. In addition to making overly optimistic statements about the likelihood of LibiGel being approved in light of the substantial risk that it was being created to treat a disorder that would no longer be recognized in the DSM, defendants failed to fully reveal the substantial difficulty in conducting efficacy trials in light of the well documented perceived effectiveness of drugs directed at increasing female sexual desire. This medical phenomenon, known as the "Placebo Effect," is commonly defined as the beneficial effect in a patient following a particular treatment that arises from the patient's expectations concerning the treatment rather than from the treatment itself. Defendants never disclosed to shareholders the likelihood that the placebo/control patients of the two Phase III efficacy trials, who were treated with an inactive simulation of LibiGel, would also report significant perceived improvement in their HSDD condition. BioSante's structure of the Phase III LibiGel efficacy trials, which recorded data utilizing a daily diary, significantly compounded the

- 2 -

potential Placebo Effect by forcing participants to ruminate on a daily, rather than weekly or longer, basis regarding their satisfying sexual events and/or desires which, in turn, resulted in skewed or biased data. Indeed, defendant Simes admitted as much when he explained LibiGel's Phase III failure, in part, by stating that "even those in the placebo group were thinking more and more about their sexual drive, and therefore their sexual activity and desire increased even without increased level of testosterone."

7.      In fact, according to a study published by Andrea Bradford and Cindy M. Meston in 2009 entitled "Placebo Response in the Treatment of Women's Sexual Dysfunctions: A Review and Commentary" (the "Bradford & Meston Study"), **_most_** potential pharmacological treatments for female sexual dysfunctions have failed to meaningfully outperform placebo, partly because women who enroll in HSDD trials already want to improve their sex lives and take an active role in seeking help. Expectancies for enhanced sexual desire could, in turn, increase a woman's perception of having desire.

8.      Indeed, BioSante was not the first company to attempt to create the so-called "female Viagra." In fact, Boehringer Ingelheim disclosed in 2010 that it was giving up on its efforts to develop such a drug, Flibanserin, in light of the substantial issues raised by the FDA concerning the safety and efficacy of Flibanserin. Biosante discounted these events and reassured investors that the FDA Advisory Committee's judgment on Flibanserin was "not relevant to the potential for FDA approval of LibiGel for the treatment of HSDD" with defendant Simes adding that "LibiGel is positioned to be the first product approved for the treatment of HSDD."

9.      Defendants repeatedly issued materially false and misleading statements and omitted critical facts regarding the commercial viability, market potential, and most importantly, likely effectiveness of their purported blockbuster drug, LibiGel, in treating HSDD. Defendants' overly optimistic statements concerning LibiGel's likely approval failed to adequately disclose and/or

- 3 -

address the potential for a significant Placebo Effect and the foreseeable removal of HSDD as an identifiable disorder.

10.     As a result, on December 14, 2011, BioSante shareholders were stunned when defendants disclosed that LibiGel failed to yield positive results in large-scale efficacy tests. According to clinical trial results, women treated with LibiGel did not experience a statistically significant increase in either total satisfying encounters or sexual desire.  In fact, in the double-blind placebo-controlled Phase III trial, LibiGel did not perform significantly better than the placebo.

11.     On this news, the trading price of BioSante's stock collapsed from $2.12 to $0.48 per share, or over 77%, and wiped out over $36 million in shareholder equity.  As a result of defendants' unlawful scheme, the Company has been named as a defendant in a costly and expensive-to-defend class action lawsuit for violations of the federal securities laws.  Additionally, the Company's goodwill, reputation and standing in the community have been severely, if not irreparably, injured. Nevertheless, the BioSante Board has not taken action against defendants to recover damages for the injuries caused by their fiduciary breaches.  By this action, plaintiffs therefore seek legal redress on behalf of BioSante.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. §1332 because there is complete diversity between all plaintiffs and defendants, the amount in controversy exceeds $75,000 exclusive of interest and costs, and this is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that is headquartered in and conducts business in this District, or is an individual who has sufficient minimum contacts with Illinois so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

- 4 -

14. Venue is proper in this Court under 28 U.S.C. §1391 because BioSante maintains its principal place of business in this District, one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to BioSante, occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15. Plaintiff Jerome W. Weinstein is and has been a shareholder of BioSante since May 23, 2011. Plaintiff Weinstein is a citizen of the state of Maryland.

16. Plaintiff Carlo Oliva is and has been a shareholder of BioSante since July 11, 2011. Plaintiff Oliva is a citizen of the state of New Jersey.

17. Nominal Party BioSante is a Delaware corporation with its principal executive offices located at 111 Barclay Boulevard, Lincolnshire, Illinois. BioSante is a specialty pharmaceutical company focused on developing products for female sexual health and oncology. BioSante is a citizen of the states of Delaware and Illinois.

18. Defendant Louis W. Sullivan ("Sullivan") has been Chairman of the Board of BioSante since 1998. He also serves on the Audit and Finance, Compensation and Nominating Committees of the BioSante Board. From 2010 to 2011 Sullivan received at least $219,000 in fees and other compensation from BioSante. Sullivan is a citizen of the state of Georgia.

19. Defendant Stephen M. Simes ("Simes") has been Vice Chairman of the Board, Chief Executive Officer ("CEO") and President of BioSante since 1998. From 2010 to 2011 Simes received at least $1,988,181 in fees and other compensation from BioSante. Simes is a citizen of the state of Illinois.

- 5 -

20.     Defendant Fred Holubow ("Holubow") has been a director of BioSante since 1999. He also serves on the Audit and Finance and Nominating Committees of the BioSante Board. From 2010 to 2011 Holubow received at least $156,000 in fees and other compensation from BioSante. Holubow is a citizen of the state of Illinois.

21.     Defendant Ross J. Mangano ("Mangano") has been a director of BioSante since 1999. He also serves on the Audit and Finance, Compensation and Nominating Committees of the BioSante Board. From 2010 to 2011 Mangano received at least $145,000 in fees and other compensation from BioSante. Mangano is a citizen of the state of Illinois.

22.     Defendant Edward C. Rosenow, III ("Rosenow") has been a director of BioSante since 1997. He also serves on the Compensation Committee of the BioSante Board. From 2010 to 2011 Rosenow received at least $139,000 in fees and other compensation from BioSante. Rosenow is a citizen of the state of Minnesota.

23.     Defendant Stephen A. Sherwin ("Sherwin") has been a director of BioSante since 2009. He also serves on the Nominating and Compensation Committees of the BioSante Board. From 2010 to 2011 Sherwin received at least $73,000 in fees and other compensation from BioSante. Sherwin is a citizen of the state of California.

24.     Defendant John T. Potts, Jr. ("Potts") has been a director of BioSante since 2009. From 2010 to 2011 Potts received at least $163,000 in fees and other compensation from BioSante. Potts is a citizen of the state of Massachusetts.

## THE FIDUCIARY DUTIES OF BIOSANTE'S
## DIRECTORS AND OFFICERS

25.     As its directors and officers, defendants owed BioSante fiduciary duties of loyalty and good faith. Defendants were required to use their utmost ability to control and manage BioSante in a fair, just, honest, and equitable manner for the benefit of the Company. Defendants were also

- 6 -

786881_1

required to act in furtherance of the best interests of BioSante so as to benefit all shareholders equally, not in furtherance of their personal interest or benefit.

26.     Each defendant owed to BioSante the duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as BioSante's corporate fiduciaries, defendants had a duty to speak the complete, full and unvarnished truth when they undertook to say anything about BioSante and/or its business.

27.     Defendants, because of their positions of control and authority as directors and/or officers of BioSante, were able to and did, directly and/or indirectly, exercise control over the wrongful acts detailed herein.  Because of their executive positions and/or access to BioSante's internal information, defendants knew or should have known that BioSante's LibiGel was not performing nearly as well as they caused BioSante to publicly state and failed to fully disclose the substantial risk that the FDA would not approve LibiGel both because of the increased risk of a Placebo Effect and their inability to control for it in testing and because of the likelihood that HSDD's removal from the DSM could significantly limit the market for LibiGel, even if it was effective (which it was not).  Defendants similarly knew or should have known that by making such false statements and omitting adverse material non-public information, they were not only breaching their fiduciary duty of loyalty owed to BioSante, but also exposing the Company to damage and injury arising from misleading BioSante shareholders.  Accordingly, defendants are not immune from liability and may not be indemnified by the Company for their disloyal acts.

28.     Each of the defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or was aware that these statements were being issued regarding the Company's financial condition, business and operations, and approved or ratified these statements. Defendants were provided with copies of BioSante's shareholder reports, press releases, earnings

- 7 -

announcements and similar false statements referenced herein before or immediately after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

29.     At all relevant times, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.

**CONSPIRACY, AIDING AND ABETTING,
AND CONCERTED ACTION**

30.     During all times relevant hereto, defendants individually and collectively initiated a course of conduct that was designed to mislead shareholders into believing that BioSante was promoting a new and successful product.  In furtherance of this plan, conspiracy, and course of conduct, defendants collectively and individually took the actions set forth herein.

31.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.

32.     The purpose and effect of defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

33.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to make false and misleading statements about the Company's financial condition and business prospects, including regarding the commercial viability, efficacy, and market potential for LibiGel, in BioSante's shareholder reports and public filings. Because the actions described herein occurred under the authority of the Board, each of the

786881_1

defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

34.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

35.     BioSante is a specialty pharmaceutical company focused on developing products for female sexual health and oncology.  Over the past decade, BioSante has been in the process of developing LibiGel, a drug designed to improve the sex drive of women suffering from female sexual dysfunction, specifically HSDD.  LibiGel is a gel formulation of testosterone designed to be quickly absorbed through the skin after application on the upper arm, delivering testosterone to the bloodstream evenly over time and in a non-invasive manner.  LibiGel is BioSante's flagship product under development.

36.     Given the success of drugs such as Viagra, Levitra, and Cialis, the industry had been in search of a "female Viagra" that could similarly prove to be a blockbuster drug to treat FSD. Approximately 43% of women ages 18-59 reportedly experience some form of sexual dysfunction, and HSDD is believed to be the most common form of female sexual dysfunction.  As a result, FDA approval of LibiGel for the treatment of HSDD would have been an important breakthrough for the Company.  Since at least February 2010, BioSante had two Phase III clinical trials in progress covered by a Special Protocol Assessment ("SPA") with the FDA to demonstrate the safety and efficacy of LibiGel in the treatment of HSDD.

- 9 -

37.     Starting in early 2010, defendants began a concerted effort to publicly promote their development of LibiGel and its likely approval by the FDA and to conceal the truth regarding the substantial risks that LibiGel would not be approved and that the capital raised to conduct the expensive testing would be wasted and lost by investors.  In furtherance of this effort, defendants caused the Company to issue various press releases hyping LibiGel's development and prospects.  Each of the statements defendants caused to be issued explained in various ways that they believed LibiGel would be the first and only treatment for FSD and that they were seeing significant increases in the number of satisfying sexual events in their clinical trials.  Each of defendant's statements and press releases failed to mention, however, that clinical trials of drugs designed to treat FSD are commonly hobbled by the "Placebo Effect" whereby the treatments do not have a statistically meaningful improvement over placebos.  Moreover, defendants never explained that the probable removal of HSDD as a recognized disorder would severely impact the market potential for LibiGel.

38.     For example, on February 8, 2010, defendants caused BioSante to issue a press release stating that defendant Simes was interviewed for "Med Tech Sentinel" and featured on its website.  During the interview, defendant Simes stated in part:

- LibiGel would be the only drug to treat female sexual dysfunction and the drug was in the last stages of Phase III testing.

- 2009 was transformational for BioSante as it would permit it to complete testing.

- The Company was well-financed.

- The Company would be able to complete enrollment in testing.

39.     On February 22, 2010, defendants caused BioSante to issue a press release announcing positive safety data for LibiGel in its Phase III clinical development program.  In addition, the press release reported extremely positive Phase II efficacy results, which failed to disclose the substantial risk that such results were skewed by the Placebo Effect and the inherent

- 10 -

flaws of the Phase II testing.  The press release, approved by defendants on or about February 22, 2010, stated in part:

> BioSante Pharmaceuticals, Inc. (NASDAQ: BPAX), today announced additional positive safety data in its ongoing LibiGel Phase III clinical development program.

> *       *       *

> The DMC, which for the second time, reviewed the LibiGel safety data on an unblinded basis, confirms what we have learned from the blinded data, that LibiGel does not pose a safety risk to the women in the study, said Stephen M. Simes, BioSante's president and CEO.  A DMC can recommend continuing, changing or stopping a study and their main responsibility is to ensure that subjects recruited to the study are not exposed to unnecessary safety risks.  Therefore, the DMC's recommendation to continue the LibiGel safety study unchanged is the best possible outcome of the DMC's second unblinded review of all adverse events.  This is very good news for BioSante and for women since LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder (HSDD) in surgically menopausal women.  *We continue to believe that LibiGel can be the first product approved by the FDA for this common and unmet medical need, also referred to as female sexual dysfunction (FSD)*.

> *       *       *

> In addition to the Phase III Cardiovascular and Breast Cancer Safety Study, BioSante is conducting two LibiGel Phase III efficacy trials.  The Phase III efficacy trials of LibiGel in the treatment of FSD are double-blind, placebo-controlled trials that will enroll up to approximately 500 surgically menopausal women each for a six-month clinical trial.  The efficacy trials are being conducted under an FDA approved SPA (special protocol assessment agreement).

> *As previously announced by BioSante, treatment with LibiGel in a Phase II clinical trial significantly increased satisfying sexual events in surgically menopausal women suffering from FSD.  The Phase II trial results showed LibiGel significantly increased the number of satisfying sexual events by 238 percent versus baseline (p<0.0001); this increase also was significant versus placebo (p<0.05)*.  In this study, the effective dose of LibiGel produced testosterone blood levels within the normal range for pre-menopausal women and had a safety profile similar to that observed in the placebo group.  In addition, no serious adverse events and no discontinuations due to adverse events occurred in any subject receiving LibiGel.  *The Phase II clinical trial was a double-blind, placebo-controlled trial, conducted in the United States, in surgically menopausal women distressed by their low sexual desire and activity*.

40.     On March 30, 2010, defendants caused BioSante to file its Form 10-K with the SEC announcing the requirements remaining for submission and approval of LibiGel by the FDA. While continuing to tout LibiGel's status as the "lead" product with potential to be the "first" approved by the FDA, defendants continued to omit the truth regarding the substantial risks that LibiGel would not be approved both because of the Placebo Effect and because HSDD was likely to be eliminated from the DSM. The Form 10-K stated in part:

> ***We believe LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder (HSDD) in menopausal women, and that it has the potential to be the first product approved by the FDA for this common and unmet medical need***. We believe based on agreements with the FDA, including an SPA, that two Phase III safety and efficacy trials and one year of LibiGel exposure in a Phase III cardiovascular and breast cancer safety study with a four-year follow-up post- NDA filing and potentially post-FDA approval are the essential requirements for submission and, if successful, approval by the FDA of a new drug application (NDA) for LibiGel for the treatment of FSD, specifically, HSDD in menopausal women.

41.     During the course of defendants' ongoing promotion of LibiGel, one of BioSante's competitors revealed that its drug had failed to overcome the Placebo Effect. On June 16, 2010, the FDA announced that "Flibanserin," another drug for the treatment of female sexual disorders that was under development by a competing company, had been found ineffective as a treatment for HSDD; its effects were not significantly different from placebo in clinical trials. The FDA Advisory Committee reviewing Flibanserin therefore recommended against any further development, testing, or work on the drug.

42.     Despite the failure of Flibanserin, defendants continued to issue false and misleading statements that failed to explain or even discuss the fact that the Placebo Effect had derailed most previous attempts to develop drugs to treat female sexual dysfunctions and would be a significant hurdle for LibiGel.

43. On June 21, 2010, defendants caused BioSante to issue a press release entitled "BioSante Pharmaceuticals Says FDA Advisory Committee Recommendation Against Flibanserin Has No Impact on LibiGel®." The release, approved by defendants on or about June 16, 2010, stated:

> "There are important scientific differences between the way LibiGel and Flibanserin work on the body, and differences in their clinical development programs," stated BioSante President and CEO Stephen M. Simes. "The LibiGel safety and efficacy trials are being conducted under an SPA (Special Protocol Assessment) agreement with FDA, a level of agreement that the Flibanserin program did not have. BioSante also is conducting a large safety study comparing LibiGel to placebo to show cardiovascular and breast-cancer safety. We are pleased also by comments made by the Advisory Committee stressing the need for a product to treat this unmet medical need. ***Given the recommendation of the Advisory Committee, we believe that LibiGel is positioned to be the first product approved for the treatment of HSDD***."

> "The Advisory Committee's judgment on flibanserin has no impact on the clinical development program of LibiGel and is not relevant to the potential for FDA approval of LibiGel for the treatment of HSDD in menopausal women," said Michael C. Snabes, MD, PhD, BioSante's vice president of clinical development.

44. Defendants continued, over time, to cause the Company to issue statements that failed to address the Placebo Effect that so prominently derailed previous attempts to develop drugs to treat FSD.

45. On July 13, 2010, defendants caused BioSante to issue a press release entitled "BioSante Pharmaceuticals Announces Initiation of LibiGel® Study to Evaluate its Effect on Cognitive Function in Women," stating in part:

> "If this study demonstrates that testosterone improves cognitive performance, learning and memory, in healthy older women with normal cognition for their age, as compared to placebo, testosterone may be a potential strategy for the prevention of cognitive decline," said Dr. [Susan] Davis [Professor of Women's Health, Monash University Women's Health Program in Australia].

> "It is exciting that a new clinical trial has been initiated to evaluate whether testosterone improves memory and learning," said Dr. Michael C. Snabes, BioSante's vice president of clinical development. "Positive results from this new

study could provide scientific evidence for an additional advantage of testosterone for menopausal women."

46.    On October 18, 2010, defendants caused BioSante to issue a press release entitled "BioSante Pharmaceuticals Reaches Key LibiGel® Safety Study Enrollment Target."  The release, approved by defendants on or about October 18, 2010, stated:

> "This milestone gives BioSante our first opportunity potentially to declare completion of enrollment in the safety study," stated Michael Snabes, M.D., Ph.D., BioSante's senior vice president of medical affairs.  "We have had an extremely low number of cardiovascular and breast cancer events to date, as well as three previous favorable DMC recommendations. We expect the study to demonstrate the safety of LibiGel in the treated population, regardless of whether the DMC stops enrollment at 2,500 women or we need to continue enrollment."

47.    Defendants continued to tout the results of *safety* tests on LibiGel and their purported belief that it will "be the first product approved by the FDA," all the while failing to disclose the substantial risk that LibiGel would not be approved, not due to safety issues, but because it is not more effective than placebo and because HSDD was likely to be eliminated from the DSM.  For example, on October 26, 2010, defendants caused BioSante to issue a press release entitled "BioSante Pharmaceuticals Reports Positive LibiGel® Data Monitoring Committee Recommendation – No safety issues observed, study to continue as per protocol without modifications."  The release, approved by defendants on or about October 26, 2010, stated:

> "We are very pleased that the DMC recommended that the study should continue without modification.  This means that there are no general or specific safety issues based on their unblinded review of adverse events.  The low number of CV events to date is consistent with the safety of testosterone in women,". . . .  "Once the DMC determines that there are enough subjects enrolled for statistical significance, enrollment of new subjects into the study will be complete.  The current LibiGel safety study protocol allows for up to 4,000 women to be enrolled."

> *      *      *

> "***With this most recent favorable DMC recommendation, we continue to believe that LibiGel will be the first product approved by the FDA to treat HSDD in menopausal women, also referred to as FSD***," said Stephen M. Simes, BioSante's president & CEO.

- 14 -

48.     On November 12, 2010, defendants caused BioSante to file its Form 10-Q with the

SEC.  This SEC Form 10-Q, approved by defendants on or about November 12, 2010, stated:

>    ***We believe LibiGel remains the lead pharmaceutical product in the U.S. in***
>    ***active development for the treatment of hypoactive sexual desire disorder (HSDD)***
>    ***in menopausal women, and that it has the potential to be the first product approved***
>    ***by the FDA for this common and unmet medical need, for which presently there is***
>    ***no FDA approved pharmaceutical product***.  We believe based on agreements with the
>    FDA, including an SPA, that two Phase III safety and efficacy trials and one year
>    of LibiGel exposure in a Phase III cardiovascular and breast cancer safety study with
>    a four-year follow-up post-NDA filing and potentially post-FDA approval and
>    product launch, are the essential requirements for submission and, if successful,
>    approval by the FDA of a new drug application (NDA) for LibiGel for the treatment
>    of FSD, specifically HSDD in menopausal women.

49.     The goodwill garnered by defendants' false and misleading statements allowed

defendants to raise additional capital from the markets through several efforts to induce investors to

purchase BioSante stock in new securities sales.  For example, on December 27, 2010, BioSante

announced that it had received commitments from several institutional investors to purchase $18

million of securities in a registered direct offering.  In a press release about the offering, defendants

caused BioSante to falsely state:

>    "We are pleased to have a commitment from these new and existing
>    institutional investors," said Stephen M. Simes, BioSante's president and chief
>    executive officer.  "This additional funding from these high quality biotechnology
>    institutional investors provides us with a strong cash position as we close out the
>    year, ensuring our ongoing focus on our LibiGel® Phase III clinical study program.
>    Our objective is to submit a new drug application (NDA) to the U.S. Food and Drug
>    Administration (FDA) by the end of 2011.  ***LibiGel remains the lead***
>    ***pharmaceutical product in the U.S. in active development for the treatment of***
>    ***hypoactive sexual desire disorder (HSDD) in menopausal women, and we continue***
>    ***to believe that LibiGel has the potential to be the first product approved by the***
>    ***FDA for this common and unmet medical need***."

50.     On this positive news, BioSante's share price increased over 26% to close at $2.00

per share on December 27, 2010.

51.     On December 31, 2010, BioSante completed another offering for 10.6 million shares of the Company's common stock and warrants to purchase 5.3 million additional shares. This offering resulted in $16.9 million in net proceeds for the Company.

52.     On January 10, 2011, defendants caused the Company to issue a press release entitled "BioSante Pharmaceuticals Confirms Female Sexual Dysfunction as an Unmet Medical Need," which discussed the characteristics of HSDD without adequately disclosing the scientific controversy surrounding the definition of the condition, which could, and ultimately did, impact LibiGel's Phase III efficacy trials. The press release stated, in part:

> **LINCOLNSHIRE, Illinois (January 10, 2011)** – BioSante Pharmaceuticals, Inc. (NASDAQ: BPAX), a pharmaceutical company developing products for the treatment of female sexual health, today announced results of a survey of over 100 Obstetrician/Gynecologists and Primary Care Physicians regarding the need for an FDA-approved drug to treat a form of Female Sexual Dysfunction (FSD) known as Hypoactive Sexual Desire Disorder (HSDD). The multiple surveys, conducted independently for BioSante by Campbell Alliance Group, Inc., revealed sexual dysfunction to be one of the most common complaints received in these doctors' offices. The physicians described themselves as dissatisfied with the current lack of therapeutic options for HSDD, a loss of libido or sexual desire.
>
> Stephen M. Simes, president and CEO of BioSante, said, "***The need for an FDA-approved treatment to cope with this condition is accepted by an astonishing over 90 percent of the doctors surveyed by Campbell. It has been more than a decade since the FDA approved Viagra for the treatment of male sexual dysfunction; it is time to provide women and their healthcare providers with a safe and effective option***."
>
> BioSante is developing LibiGel®, a testosterone gel, for treatment of HSDD in menopausal women. LibiGel is currently in three Phase III clinical studies to prove its safety and efficacy.

53.     On March 4, 2011, defendants caused BioSante to issue a press release announcing another registered direct offering and reiterating and repeating the expectation to be the first company to have a drug approved by the FDA to treat HSDD. The release, approved by defendants on or about March 4, 2011, stated:

"We are pleased to have this commitment from these new and existing institutional investors," said Stephen M. Simes, BioSante's president and chief executive officer. "This additional funding provides us with added financial power to continue to fund our ongoing LibiGel® Phase III clinical study program. We recently announced completion of enrollment in the first of the two LibiGel Phase III efficacy trials and expect to announce completion of enrollment in the second in the near future. *LibiGel remains the lead pharmaceutical product in the U.S. in active development for the treatment of hypoactive sexual desire disorder (HSDD) in menopausal women, and we continue to believe that LibiGel has the potential to be the first product approved by the FDA for this common and unmet medical need*."

54.     On March 9, 2011, BioSante announced the completion of yet another direct offering of 12.2 million shares of the Company's common stock and warrants to purchase 4.0 million additional shares. This offering resulted in $23.8 million in net proceeds for the Company.

55.     On March 16, 2011, defendants caused BioSante to issue a press release, this one announcing its financial results for 2010 and reporting on the Company's clinical development. The release, approved by defendants on or about March 16, 2011, stated:

"*We are very pleased with our progress over the last year* as well as our current cash balance," said Stephen M. Simes, BioSante's president and CEO. "Through careful cash management and our financing strategy, we believe we now have removed any near-term financial risk from BioSante, and our current cash balance is sufficient to finance our operations and LibiGel clinical development well into 2012, without need for additional funds."

*        *        *

**LibiGel® Clinical Highlights**

The increased LibiGel clinical development expenses during 2010 *was the result of steady progress in BioSante's LibiGel Phase III clinical program*. LibiGel is in development for the treatment of female sexual dysfunction (FSD), specifically, hypoactive sexual desire disorder (HSDD) in menopausal women, for which there is no FDA-approved product. In February 2011, the company announced completion of enrollment in the first of two LibiGel Phase III efficacy trials, and expects enrollment in the second efficacy trial to be completed in the near future. BioSante continues to expect data from the two efficacy trials in Fall 2011.

56.     On March 30, 2011, defendants caused BioSante to issue a press release entitled "BioSante Pharmaceuticals Completes Enrollment in Both Pivotal LibiGel® Phase III Efficacy Trials." This release stated in part:

- 17 -

786881_1

BioSante Pharmaceuticals, Inc. (NASDAQ: BPAX) today announced that enrollment of subjects in the second of two pivotal Phase III LibiGel (testosterone gel) safety and efficacy trials has been completed. Enrollment in the first LibiGel efficacy trial was completed in February. The efficacy trials are being conducted under an FDA-approved special protocol assessment (SPA) agreement. LibiGel is in development for the treatment of female sexual dysfunction (FSD), specifically, hypoactive sexual desire disorder (HSDD) in menopausal women, for which there is no FDA-approved product.

"This is an important achievement for BioSante and a key step toward completing the LibiGel Phase III clinical development program" . . . . "There are more than 1,000 subjects in the efficacy trials and we anticipate announcing top-line efficacy data this fall."

57.     On April 15, 2011, defendant Simes presented at the Future Leaders in the Biotech Industry Conference, during which he leveraged the purportedly successful Phase II data into further optimism for LibiGel's Phase III success, stating, in relevant part:

If you look at our Phase II data, a similar dose by the way. We delivered 300 micrograms a day, which is exactly the dose shown in the past to be effective. ***Now in ten published Phase III studies we showed a remarkable 238% increase in the number of satisfying sexual events, which was statistically significant significantly better than placebo. We hope to repeat these data in our Phase III studies. Now we've powered the studies to show a difference of one from placebo, one sexual event from placebo, even though in this study we showed a difference of over three satisfying sexual events over placebo***.

Another way to look at the data, and how much we further see this, and you can see in the first month, and this is four week increments is how these are measured, and it's the last four weeks of the study compared to the base line four weeks, number of the events compared to number of events. At baseline our women had about 2.5 satisfying sexual events. And of course I am compelled to say, don't ask me what a 0.5 sexual event is. However in the first month over four weeks of therapy there was an increase of 100% in the member of satisfying sexual events overly out of this 238% increase over the course of the three months study.

58.     During the same conference on April 15, 2011, defendant Simes discussed the FDA's guidance on development of drugs for FSD since 2000, while failing to disclose the significant alterations taking place to the HSDD definition in the scientific and academic community, stating, in part:

- 18 -

Sexual events are defined as intercourse, masturbation or oral sex, giving or receiving. And the satisfying is the yes or a no answer, that is will the women find this experience to be satisfying. There are no questions of the partner. These are measured in a daily diary, a validated daily diary according to the FDA's published guidance on validation of those instruments, patient reported outcome instruments.

The secondary end point is a decrease in the stress associated with low sexual desire. Let me comment, because there is some question about this often. And that is the FDA first issued its guidance on development of drugs for female sexual dysfunction in 2000. And the requirements for a product from a efficacy point of view have not change since 2000, that is the two primary end points have always been an increase in desire and sexual activity and are secondary endpoint of the decrease in distress.

59. On May 31, 2011, defendants caused BioSante to issue a press release strongly suggestive of the conclusion that LibiGel would soon be the first product approved by the FDA for the treatment of HSDD. The release, approved by defendants on or about May 31, 2011, stated:

"LibiGel remains the only product in the world in Phase III clinical development for the treatment of HSDD," said Stephen M. Simes, BioSante's president & CEO. "The ability to stop enrollment as per the sample size analysis that indicates *a 90 percent predictive probability of success is very encouraging for the outcome of our LibiGel Phase III clinical development program. With this most recent development, we continue to believe that LibiGel will be the first product approved by the FDA to treat HSDD*, also referred to as FSD, in menopausal women."

60. On August 5, 2011, defendants caused BioSante to file its Form 10-Q with the SEC, which misrepresented, among other things, that "LibiGel remains the most clinically advanced pharmaceutical product in the U.S."

61. On October 4, 2011, defendants caused BioSante to issue a press release entitled "BioSante Pharmaceuticals Completes Both Pivotal LibiGel® Efficacy Trials," which stated, in relevant part:

**LINCOLNSHIRE, Illinois (October 4, 2011)** – BioSante Pharmaceuticals, Inc. (NASDAQ: BPAX) today announced completion of its two pivotal LibiGel (testosterone gel) efficacy trials, required for the company's anticipated LibiGel new drug application (NDA). The final visit of the last subject enrolled in the second of the two pivotal LibiGel Phase III efficacy trials occurred at the end of September. LibiGel is in development for the treatment of female sexual dysfunction (FSD),

- 19 -

specifically, hypoactive sexual desire disorder (HSDD) in menopausal women, for which there is no FDA-approved product.

Data are being collected from the 141 investigative sites in the U.S. and Canada that participated in the two trials, and BioSante expects to announce top-line LibiGel efficacy results during this quarter. Both efficacy trials were conducted according to an FDA-agreed special protocol assessment (SPA). The third and last pivotal study for the LibiGel clinical development program is the ongoing LibiGel Phase III cardiovascular and breast cancer safety study, which has completed enrollment of 3,656 subjects. The primary analysis of safety data is targeted for third quarter of 2012. The LibiGel NDA submission will include data from the two efficacy trials as well as the safety study and is targeted for the fourth quarter of 2012.

"We are delighted to have completed both LibiGel Phase III efficacy trials. We appreciate the diligence of the investigative sites and their care of the subjects in the trials, and we also thank the participating subjects," noted Joanne Zborowski, BioSante's vice president of clinical development. "There were over 1,100 subjects enrolled in the two efficacy trials, and we look forward to analyzing the data and announcing the results later this year."

62. On October 21, 2011, defendant Simes presented at the BioCentury Publications Inc. NewsMakers in the Biotech Industry Conference, during which he discussed the critical separation LibiGel achieved in comparison to placebo during the Phase II trial, without adequately disclosing LibiGel's realistic and foreseeable failure to meaningfully outperform placebo during Phase III efficacy trials, stating, in relevant part:

These are the results of our Phase II trial and that was a three-month trial. So remember, Phase III is six months. We know from the literature including Procter & Gamble's publications on Intrinsa that maximum effect is reached in months four and five and then the effect tends to level off. It does not fall as long as the woman continues to take testosterone therapy.

But at baseline in the four weeks at baseline the women in this study had 2.5 satisfying sexual events and you can see an increase of 2.6 satisfying sexual events in the first four weeks. So a 100% increase in the number of events, all the way out to a 238% increase over the course of three months.

What's most critical here is the difference from placebo, a difference of 3.4 satisfying sexual events more in the LibiGel group than in the placebo group. Not only was this statistically significant, but we believe highly clinically meaningful, which is a very important consideration in these studies.

- 20 -

63.     On October 25, 2011, Simes once again discussed Phase II LibiGel data without

adequately disclosing the likelihood of a significant Placebo Effect which could, and ultimately did,

lead to LibiGel's failure to meaningfully outperform placebo in the treatment of women's sexual

dysfunctions.  Simes stated in part:

> The SPA defines and has agreement on the clinical trial design, the clinical
> end-points, sample sized planned conduct and statistical analysis.  So, we feel as well
> as you can have an agreement, and in this case a written agreement with the FDA
> that the trials are designed to bring in the data that the FDA will require for an
> approval we feel very comfortable.
>
> These are the result of our Phase II study.  The Green line you see there is the
> placebo effect.  And as you can imagine in these studies there is a placebo effect, but
> slightly there is an hot flash studies or even depression or pain studies.
>
> But, your hope is that the placebo will [plateau], because if it kept getting
> better of course there is no reason for therapy, in fact it did.  But you can see in the
> LibiGel group, the number of satisfying sexual events increased by about a 100% in
> the first four weeks.  Remember at baseline they had 2.5 satisfying sexual events in
> the baseline four weeks.

64.     On November 9, 2011, defendants caused BioSante to file its Form 10-Q with the

SEC further publicizing the development of its breakthrough new drug for the treatment of HSDD.

The Form 10-Q stated in part:

> We believe LibiGel remains the most clinically advanced pharmaceutical
> product in the U.S. in active development for the treatment of hypoactive sexual
> desire disorder in menopausal women, and that it has the potential to be the first
> product approved by the FDA for this common and unmet medical need.  We believe
> based on discussions with the FDA, including an SPA relating to the design of our
> two LibiGel Phase III safety and efficacy trials, that these trials and our Phase III
> cardiovascular and breast cancer safety study are the essential requirements for
> submission and, if successful, approval by the FDA of an NDA for LibiGel for the
> treatment of FSD, specifically HSDD in menopausal women.

**A.     Defendants Knew About but Failed to Disclose Issues Related to the Definition
        of HSDD**

65.     During the course of their ongoing promotion of LibiGel, defendants never disclosed,

let alone discussed, the looming changes to HSDD as a defined and treatable disorder.  According to

the DSM-IV, the primary indicator of HSDD is defined as follows:

- 21 -

A. ***Persistently or recurrently deficient (or absent) sexual fantasies and desire for sexual activity***. The judgment of deficiency or absence is made by the clinician, taking into account factors that affect sexual functioning, such as age and the context of the person's life.

B. The disturbance causes marked distress or interpersonal difficulty.

C. The sexual dysfunction is not better accounted for by another Axis I disorder (except another Sexual Dysfunction) and is not due exclusively to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

66. HSDD is primarily characterized by Criterion A, the deficiency or total lack of sexual fantasies and desire. Since 1999, before BioSante began developing LibiGel, the APA has been researching revisions for the DSM-5. The work groups tasked with researching these revisions periodically published draft DSM-5 diagnostic criteria for public comment, the first of which was available on February 10, 2010. The final commenting period on the draft DSM-5 closed on June 15, 2012.

67. When the first draft of the DSM-5 was published for public comment on February 10, 2010, it became clear that these revisions included substantial changes to the definitions of various sexual dysfunctions – and HSDD was, in fact, ***to be removed as a singular disorder and integrated with an arousal disorder to form a more restrictive category of FSD called SIAD***.

68. As recently as April 30, 2012, SIAD was defined in the draft DSM-5 as a lack of sexual interest/arousal for a six-month duration as manifested by at least three of the following indicators:

1) absent/reduced interest in sexual activity;

2) absent/reduced sexual/erotic thoughts and fantasies;

3) no initiation of sexual activity and not receptive to partner's attempts to initiate;

4) absent/reduced sexual excitement/pleasure during sexual activation on at least 75% of occasions of sexual activity;

5)      Desire not triggered by sexual/erotic stimulus; and/or

6)      Absent/reduced genital or nongenital physical changes during sexual activity on at least 75% of occasions of sexual activity which causes distress and is not due to a physiological substance or general medical condition.

69.      The new SIAD category is much more restrictive, which significantly changes the number and demographic of women who actually could be diagnosed with one of these desire or arousal disorders. The APA explicitly chose to make this category more restrictive and acknowledged that HSDD/FSAD may be over-diagnosed: "[t]he current standard for diagnosing a sexual dysfunction often results in inflated estimates of the proportion of women meeting criteria for a sexual dysfunction."[1] *This change affects both market share for LibiGel and the population of patients enrolled in the clinical trials*. With fewer women who could potentially be diagnosed with a desire disorder, defendants' $2-billion-market estimate was vastly overstated. And with the creation of five other symptomatic criteria, it is likely that BioSante's trial patient population did not accurately reflect the proper demographic of women with SIAD.

70.      Moreover, one of the APA's reasons for removing the word "Hypoactive" from the proper name of the disorder is related explicitly to the fact that "[s]ome interpret the 'hypo' in HSDD to infer a biological deficiency of testosterone."[2] The APA's suggestion that *HSDD (or SIAD) is not caused by a testosterone deficiency* completely undermines BioSante's entire LibiGel premise, and at the very least confirms the uncertainty surrounding testosterone's ability to treat symptoms even loosely associated with HSDD. While there remains no definitive proof on testosterone's efficacy, this statement by the APA certainly raises more questions than assurances regarding

---

[1]      American Psychiatric Association, DSM-5 Development, Proposed Revisions, N 04 Female Sexual Interests/Arousal Disorder, http://www.dsm5.org/Lists/ProposedRevision/DispForm.aspx?ID=432 (last visited November 19, 2012).

[2]      *Id.*

- 23 -

BioSante's testosterone gel – a fact defendants failed to ever disclose when they promoted LibiGel and its development.

71.     Defendants were undoubtedly aware of the controversial nature of the HSDD condition within the medical community.  For example, on May 17, 2010, BioSante presented at the Rodman & Renshaw Global Investment Conference, in which defendant Simes acknowledged the importance of getting an SPA, in light of the controversial nature of HSDD, stating, "[t]he SPA here, critical point is, since there is no product approved for this indication, *we thought it was important to get the FDA on record as saying that in fact female sexual dysfunction is a diagnosable condition with measurable endpoints and that women deserve an option, a therapeutic option*."

72.     Similarly, during an October 21, 2011 presentation at the BioCentury Newsmakers In The Biotech Industry Conference, defendant Simes stated, in relevant part:

> *The SPA, we applied for these SPAs early on because we felt that since there is no product approved for this indication we should get the FDA on record as acknowledging that in fact there is a condition here that with measurable endpoints – and women deserve an option*.

73.     However, defendants never adequately discussed the proposed changes to the new DSM-5 when they publicly discussed LibiGel and its clinical trial performance or the substantial risk and decreased market potential for LibiGel if HSDD was excluded from the DSM.  Moreover, these changes to the DSM were foreseeable.  Most of the proposed DSM-5 revisions reflect theories that have been leading the discussion on female sexual dysfunctions for years and each of the changes were subject to public comment since at least February 2010.  BioSante's backwards approach to what they repeatedly call an important "unmet medical need" demonstrated that the Company was either recklessly out of touch with the issues surrounding female sexual dysfunction, or intentionally ignored those issues in an attempt to rush LibiGel into the market before the DSM-5 was discussed outside of scientific circles.

786881_1

**B.**   **Defendants Knew About but Failed to Disclose the High Possibility of a Placebo Effect**

74.    According to the Bradford & Meston Study, most potential pharmacological treatments for FSD have "failed to meaningfully outperform placebo in the treatment of women's sexual dysfunctions."[3] Consequently, no pharmaceutical company has developed an FDA-approved drug for women's sexual desire or arousal disorders.

75.    The Bradford & Meston Study evaluated the placebo group outcomes in sixteen women's sexual dysfunction studies, seven of which compared the efficacy of placebo to that of testosterone in the form of a transdermal patch or topical cream.  Six of the seven studies looked at patient populations consisting of post-menopausal women.  Among those six studies, "ratings of sexual desire or sexual interest significantly increased from baseline levels among placebo recipients. . . .  Reductions in personal distress among placebo groups were also evident in several studies."[4]  Given the strong Placebo Effect in sexual desire dysfunction trials, the Bradford & Meston Study concluded:

> Although most clinical trial reports understandably focus on the effect of an active treatment over and above that of placebo, ***statistical significance alone is not a satisfactory criterion for evaluating the difference between placebo and active treatments***.  If effects were reported in more robust terms, such as the percentage of participants no longer meeting criteria for sexual dysfunction after treatment, then the relative effects of placebo and active treatments would have greater relevance to clinical practice.[5]

76.    The high possibility of Placebo Effect in the HSDD trials is also a function of psychological factors.  For example, women who enroll in HSDD trials already want to improve

---

[3]    Andrea Bradford & Cindy M. Meston, *Placebo Response in the Treatment of Women's Sexual Dysfunctions: A Review and Commentary*, 35 J. Sex & Marital Therapy 164, 165 (2009).

[4]    *Id.* at 174.

[5]    *Id.* at 177.

their sex lives and take an active role in seeking help. Moreover, expectancies for enhanced sexual desire could increase a woman's perception of having desire. Participation in an HSDD trial compels a woman to regularly communicate and record her sexual experiences, keeping sexual activity at the forefront of her mind.[6]

77.     Despite the significant risk of these confounding factors potentially leading to a higher Placebo Effect, defendants failed to cause BioSante to structure the LibiGel trials in a manner that would minimize the Placebo Effect. Specifically, BioSante chose to record the primary endpoints of the studies with a daily diary, as opposed to a weekly diary. The contributing effects of a daily diary on the Placebo Effect in sexual dysfunction trials are well known. In fact, a 2005 article authored by Stanley Althof, et al., entitled "Outcome Measurement in Female Sexual Dysfunction Clinical Trials: Review and Recommendations" concluded:

> [D]aily completion of a diary may create a skewing or biasing of the data. By completing a daily diary subjects are forced to reflect on their level of desire, arousal or satisfaction which may act as an intervention contributing, in part, to the high placebo response rates seen in FSD studies.[7]

78.     On the same date BioSante released the top-line results from its two pivotal Phase III LibiGel efficacy trials, the Company held a conference call to discuss the results, in which defendant Simes readily admitted that the Placebo Effect, caused in part by the daily-diary submission, contributed to the Phase III efficacy failure, stating:

> At this point, we can only speculate about the reasons for the placebo effect including the effect of the daily administration of the product, ***and the daily recording of the events by each subject as well as the monthly visits and various reminders that our investigators send out to their subjects***.

---

[6]     Sheryl A. Kingsberg & Stanley E. Althof, *Satisfying Sexual Events as Outcome Measures in Clinical Trial of Female Sexual Dysfunction*, J. Sex. Med. 1, 5 (2011).

[7]     Stanley Althof, et al., *Outcome Measurement in Female Sexual Dysfunction Clinical Trials: Review and Recommendations*, 31 J. Sex & Marital Therapy 153, 161 (2005).

786881_1

With all of these actions by and with the subjects participating in these trials, *we believe that even those in the placebo group were thinking more and more about their sexual drive, and therefore their sexual activity and desire increased even without increased level of testosterone*.

\*    \*    \*

W[he]ther in fact and we are just asking the question, we don't have an answer whether in fact, *most of the efficacy or most of the benefit from that is the woman's own reaction to being treated as opposed to the testosterone because at least in our two trials, testosterone did not seem to be indicative of efficiency*.

\*    \*    \*

*But unfortunately it is not LibiGel did not work, the problem is that both arms work equally well and it's an interesting situation*, however I am told by others that in other areas for example depression as many as 50% of depression trials fail because of placebo event and this is something that is a major issue for our industry so, truly there is no treatment arm because the women in our study were well taking care of in both arms and so there is truly no treatment arm and we have suffered the consequences of that.

79.    Similarly, during the June 6, 2012 Jefferies Global Healthcare Conference, defendant

Simes stated the following:

So these are the results of one of the two Phase III trials, but they are about the same. And what you can see is that LibiGel performed as predicted and as well as or even better than previous testosterone products have done in this population. And what we are looking at on this slide is an increase in the number of satisfying sexual events. This is one of the key primary endpoints. And you can see that from baseline, these women at baseline had about four satisfying sexual events in the baseline four-week period, and they increased by about between three and four satisfying sexual events at the end of the study. *So the LibiGel performed very, very well. So we've increased these women by about 80% and the number of satisfying sexual events that they reported. Unfortunately, the placebo did as well*. And so what we've been doing over these last several months is not only internally but consulting with experts about how we might mitigate the placebo response.

*To really put it in perspective, on this slide, you can see the two top lines or the two placebos in our two Phase III efficacy trials. And so the placebo did extraordinarily well*. In fact, we created a therapeutic effect in these women.

80.    Thus, defendants were undoubtedly aware of, and/or recklessly disregarded, the

potentially high Placebo Effect, given the nature of the HSDD condition and the structure of the

daily-diary submission during the clinical trials, and yet defendants never disclosed the full extent of risk of a high Placebo Effect to the investing public.

81.     In fact, BioSante restructured the Phase III clinical efficacy trials in 2012 in an attempt to reduce the Placebo Effect by shifting from a daily-diary entry to a weekly-diary entry. Defendant Simes acknowledged on June 11, 2012, the day the Company announced the intention to continue LibiGel clinical development, the serious impact daily versus weekly diary entry structure could have on the clinical trials, stating:

> We just plan on making changes so that the outcome will be different. ***Daily diary versus weekly diary is a critical factor***.
>
> In fact surely after we published our data or announced our data in December of last year, a paper appeared by Sheryl Kingsberg, a lead clinician in this area who – and they – and she published a paper saying that her analysis of this indication daily d[ia]ries are just not as effective as weekly d[ia]ries. ***So, in addition to the body of data that exist in the published clinical trials, we have others and experts in this area that also agree that daily versus weekly is an issue***.

82.     Ultimately, defendants not only failed to adequately warn investors of the risk of high placebo response, but they recklessly compounded the problem by overstating/overhyping the correlation between testosterone levels and desire.

### THE TRUTH IS REVEALED

83.     On December 14, 2011, defendants finally caused BioSante to reveal for the first time that LibiGel had failed to yield positive results in large-scale efficacy tests designed by the Company.  According to the clinical trial results, women treated with LibiGel did not experience a statistically significant increase in either total satisfying sexual encounters or sexual desire, when compared to the placebo.  In fact, in the double-blind placebo-controlled trial, LibiGel did not fare significantly better than the placebo.  More specifically, defendants stated:

> "We obviously are very disappointed by the Phase III LibiGel efficacy trial results.  We have been committed to LibiGel for many years and we are committed to determining the future of LibiGel," stated Stephen M. Simes, BioSante's president

- 28 -

& CEO. "We will continue to analyze the efficacy trial data fully and determine plans for our next steps in the LibiGel development plan, and provide an update at a later time. While the LibiGel Phase III cardiovascular and breast cancer safety study currently continues as planned, we will be analyzing the best path forward for the study given the results reported today. I want to thank our entire BioSante clinical team and the clinical investigators for their tireless efforts in these trials, and I also want to thank the women enrolled in the BLOOM trials for their participation."

84.     On this news, BioSante's share price collapsed by $1.64 per share, or over 77%, instantly wiping out over $36 million in shareholder equity. Despite these tremendous losses to investors from the revelation that LibiGel did not work, defendants profited substantially during the relevant period through their salaries and other payments.

## DAMAGES TO BIOSANTE

85.     As a result of defendants' false statements, BioSante has been severely injured and damaged. Millions of dollars in shareholders' equity has been wiped out. The Company has also been named as a defendant in a complex and expensive-to-defend securities class action lawsuit.

86.     Moreover, these actions irreparably damaged BioSante's corporate image and goodwill. The financial viability of the Company and the motives of management have been put in serious doubt. For at least the foreseeable future, BioSante will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in unlawful conduct and/or have misled their shareholders, such that BioSante's ability to raise capital or debt on favorable terms in the future is now impaired, as has been shown by subsequent events.

## DEMAND FUTILITY ALLEGATIONS

87.     Plaintiffs incorporate ¶¶1-86.

88.     Plaintiffs did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act for the following reasons.

89.     First, the members of BioSante's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations, or to sue themselves or their fellow

786881_1

directors and allies in the top ranks of the corporation for the violations of law complained of herein. The Board members have professional relationships with, are friends with, and have entangling financial alliances, interests and dependencies with the other defendants. Because of these relationships, the Board is unable to and will not vigorously prosecute any such action.

90. Second, LibiGel was BioSante's primary product and the Company's continued ability to operate was dependent on LibiGel's success. As BioSante directors and officers, defendants had access to all of the information, reports, and clinical data regarding LibiGel and its prospects. Thus, all information related to LibiGel's clinical trials, including the design of the trials, FDA communications and approvals regarding the clinical trials, the performance of the trials, the substantial hurdles underlying the trial design and outcomes, LibiGel's efficacy and its commercial viability, was material to each of the director defendants. Despite the material nature of LibiGel to BioSante and each director, the director defendants repeatedly approved false and misleading statements regarding LibiGel's performance in clinical trials and its prospects for success. Accordingly, none of the director defendants can exercise independent business judgment in deciding whether or not to bring and vigorously prosecute this action because they each face substantial likelihood of liability for breaching their fiduciary duty of loyalty and any demand upon them would be futile.

91. Third, the BioSante Board participated in, approved and/or permitted the wrongs alleged herein to have occurred, participated in efforts to conceal or disguise those wrongs from BioSante's shareholders, or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations and contacts with other corporate officers, employees, and directors, and attendance at management and/or Board meetings, each of the defendants knew or recklessly disregarded the adverse non-public information regarding BioSante's business and

786881_1

financial condition, specifically that LibiGel failed to yield positive results compared to placebo and in efficacy tests and, therefore, was unlikely to receive FDA approval or have significant market potential.

92.     Fourth, pursuant to their specific duties as Board and Board Committee members, the members of the BioSante Board are charged with managing the Company and conducting its business affairs.  Defendants breached the fiduciary duties of loyalty, candor and good faith owed to BioSante by making false and misleading statements about the Company's financial condition and business prospects, including regarding the commercial viability, efficacy, and market potential for LibiGel, in BioSante's shareholder reports and public filings.  The BioSante Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, because each of its members participated in the wrongdoing or are interdependent with other defendants who did.

93.     Fifth, as members of the Audit and Finance Committee, defendants Sullivan, Holubow, and Mangano had particular fiduciary responsibilities over and above those conferred by their roles as directors of BioSante.  Defendants Sullivan, Holubow, and Mangano specifically were responsible for:

- Overseeing BioSante's accounting and financial reporting processes, systems of internal control over financial reporting and disclosure controls and procedures on behalf of the Board and reporting the results or findings of its oversight activities to the Board.

- Overseeing BioSante's system to monitor and manage risk, and legal and ethical compliance programs, including the establishment and administration (including the grant of any waiver from) a written code of ethics applicable to each of BioSante's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

- Reviewing and discussing with management and the independent auditor, together and in separate sessions, the adequacy and effectiveness of

BioSante's internal control over financial reporting, including the Company's SEC filings.

- Reviewing any disclosures made to the Committee by BioSante's CEO and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies and material weaknesses in the design or operation of BioSante's internal control over financial reporting and any fraud involving management or other employees who have a significant role in BioSante's internal control over financial reporting.

- Discussing with management their review of the adequacy of BioSante's disclosure controls and procedures, the effectiveness of such controls and procedures and any findings following such review.

- Reviewing BioSante's system to monitor, assess and manage risk and legal and ethical compliance program.

- Reviewing and discussing with management and the independent auditor prior to the filing of BioSante's Annual Report on Form 10-K, and 10-Q, BioSante's annual and periodic financial statements and related footnotes and other financial information, including the information in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of such report.

94.    Defendant Sullivan, as Chairman of the Board and as a member of the Audit and Finance Committee, and defendants Holubow and Mangano, who also sat on the Audit and Financial Committee, were privy to material information not timely disclosed to the investing public and is therefore responsible directly and indirectly for the breaches of fiduciary duty as alleged herein. Defendants Sullivan, Holubow and Mangano are not capable of objectively considering a demand that BioSante initiate litigation that would result in their personal liability. Demand on Sullivan, Holubow and Mangano would be futile.

95.    Sixth, Simes, as Vice Chairman of the Board, CEO and President of BioSante, was both privy to the material adverse information withheld from shareholders and personally and directly responsible for disseminating and causing BioSante to disseminate misleading public announcements and to make misleading regulatory filings. Additionally, defendant Simes is employed full-time by the Company, and has received and continues to receive substantial monetary

- 32 -

compensation as a result of that employment. Defendant Simes will act to preserve his position of control and the prerequisites thereof, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action. For example, Simes received at least $1,988,181 in fees and other compensation from BioSante. Defendant Simes is not capable of objectively considering a demand that BioSante initiate litigation that would result in his personal liability. A demand that Simes initiate litigation that would have as its object finding him guilty of fiduciary breaches, and likely require clawback from his nearly $2 million in compensation, would be futile.

96.     Because of this, a demand made on a Board that includes Simes, Sullivan, Holubow, and Mangano as four of its seven members would therefore be a useless and futile act.

97.     Seventh, the acts complained of constitute violations of the fiduciary duty of loyalty, candor and good faith owed by BioSante directors and these acts are incapable of ratification.

98.     Eighth, the members of BioSante's Board have benefitted, and will continue to benefit, from the wrongdoing herein alleged; have engaged in such conduct to preserve their positions of control and the prerequisites derived thereof; and are incapable of exercising independent objective judgment in deciding whether to bring this action. At least two of the Board members benefitted directly and immediately under the terms of the announced merger: they were rewarded with seats on the board of the merged company.

99.     Ninth, any suit by the directors of BioSante to remedy these wrongs would likely further expose defendants to liability under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

100.    Tenth, BioSante has been and continues to be exposed to significant losses due to the wrongdoing complained of herein, yet the BioSante Board has not filed any lawsuits against

defendants or others who were responsible for that wrongful conduct to attempt to recover for BioSante any part of the damages BioSante suffered and will suffer thereby.

101.    <u>Eleventh</u>, demand is excused because the conduct alleged herein, including the issuance of false and misleading statements to shareholders, was not the product of a valid exercise of business judgment. The conduct of the directors/defendants alleged herein, including the issuance of false and misleading statements to shareholders, was so egregious on its face that Board approval cannot meet the test of business judgment, and a substantial likelihood of director liability for breach of fiduciary duty therefore exists.

102.    Plaintiffs have not made any demand on shareholders of BioSante to institute this action since such demand would be a futile and useless act for the following reasons:

        (a)     BioSante is a publicly traded company with approximately 109 million shares outstanding and many thousands of shareholders;

        (b)     Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

        (c)     Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

## (Breach of Fiduciary Duty Against All Defendants)

103.    Plaintiffs incorporate ¶¶1-102.

104.    Defendants owe BioSante undivided fiduciary duties of loyalty, candor and good faith.

105.    Defendants have violated their fiduciary duties of loyalty, candor and good faith. More specifically, defendants, in breach of these fiduciary duties, made and/or participated in

- 34 -

making false statements and omitted to disclose adverse material non-public information regarding the Company's financial condition and business prospects, specifically the commercial viability, efficacy, and market potential for LibiGel, the Company's leading potential product, in BioSante's public filings, shareholder reports and other public announcements.

106.    By reason of the foregoing acts, practices and course of conduct, defendants have failed to faithfully discharge their fiduciary duties owed to BioSante and its shareholders.

107.    As a proximate result of defendants' misconduct, BioSante has been injured and is entitled to damages.

## COUNT II

### (Abuse of Control Against All Defendants)

108.    Plaintiffs incorporate ¶¶1-107.

109.    At all relevant times, defendants employed an unlawful scheme for the purpose of maintaining and entrenching themselves in their positions of control, power, prestige and profit at BioSante.  As a part of this scheme, defendants made, caused to be made, and/or participated in the making of misrepresentations regarding BioSante's financial condition and business prospects.

110.    Defendants' conduct constituted an abuse of their ability to control and influence BioSante.

111.    As a proximate result of defendants' misconduct, BioSante has been injured and is entitled to damages.

## COUNT III

### (Unjust Enrichment Against All Defendants)

112.    Plaintiffs incorporate ¶¶1-102.

786881_1

113.     As a result of the misconduct particularized herein, defendants have been unjustly enriched at the expense of BioSante, in the form of unjustified fees, salaries, stock awards and other emoluments of office.

114.     All the payments and benefits provided to defendants were at the expense of BioSante.  The Company received no benefit from these payments.

115.     As a proximate result of defendants' misconduct, BioSante has been injured and is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not benefit thereby;

B.     Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all fees, salaries, stock awards and other payments, and imposing a constructive trust thereon;

C.     Directing BioSante to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws and state corporation laws regarding fiduciary duties of loyalty, candor and good faith;

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys' fees and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

- 36 -

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  November 20, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
BENNY C. GOODMAN III
ERIK LUEDEKE

                    s/ Benny C. Goodman III
                      BENNY C. GOODMAN III

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar# 6255605)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Lead Counsel for Plaintiffs

LAW OFFICES BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

- 37 -

786881_1

**VERIFICATION**

I, Jerome W. Weinstein, hereby verify that I am familiar with the allegations in the Verified Consolidated Shareholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this ___ day of November, 2012.

By: _____

JEROME E. WEINSTEIN

## VERIFICATION

I, Carlo Oliva, hereby verify that I am familiar with the allegations in the Verified Consolidated Shareholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this __11__ day of November, 2012.


By: _____*Carlo Oliva*_____

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 20, 2012.

s/ Benny C. Goodman III
BENNY C. GOODMAN III

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  bennyg@rgrdlaw.com

786881_1

# Mailing Information for a Case 1:12-cv-03480

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Barz**
  jbarz@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Ashley John Burden**
  ashley.burden@dechert.com,nycmanagingclerks@dechert.com

- **Benny C. Goodman , III**
  bennyg@rgrdlaw.com,e_file_SD@rgrdlaw.com,ldeem@rgrdlaw.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **David H. Kistenbroker**
  david.kistenbroker@dechert.com,nycmanagingclerks@dechert.com

- **Erik W. Luedeke**
  eluedeke@rgrdlaw.com,ldeem@rgrdlaw.com

- **Carl E. Volz**
  carl.volz@dechert.com,nycmanagingclerks@dechert.com,nicole.ladue@dechert.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)